No. 13,844.

STATE EX REL., CITY OF NEW ORLEANS ET AL. VS. HON. FRED D. KING, JUDGE DIVISION "B"—CIVIL DISTRICT COURT.

SYLLABUS.

1. The City of New Orleans is acting within the scope of its administrative and police power in authorizing the laying of a third rail in connection with the re-arrangement of the tracks upon, and the paving of, one of its streets, though the question of the right of the particular company actually laying such rail to make use of the same is involved in litigation. Whether it is advisable to lay the rail under such circumstances, in order to provide against the possible future breaking up of the pavement for that purpose, is a matter of legislative discretion.

2. Street railway companies do not own the soil of the streets of New Orleans upon which their tracks are laid, and their ownership of the ties, rails, etc., constituting their tracks, is qualified by the fact that the City of New Orleans has the right to authorize other roads to use such tracks.

3. In this case an injunction issued to restrain the laying of a third rail, the laying of which was authorized by the City of New Orleans. Held: That the

injunction should have been dissolved, as on bond, upon the application of the city, and, on bond, upon the application of the company acting under such authority, and *mandamus* to that effect is made peremptory.

A PPLICATION for a writ of *Mandamus*.

*Samuel L. Gilmore,* City Attorney, and *Harry H. Hall* for Relators.

Respondent Judge *pro se.*

*Darl & Kernan* of Counsel.

The opinion of the court was delivered by

MONROE, J. The relators, the city of New Orleans and the St. Charles Street Railroad Company (which for the purposes of the present opinion will be called the St. Charles Company) apply for a writ of *mandamus* to compel the dissolution, on bond, and under the statute, of an injunction issued against them at the instance of the New Orleans and Carrollton Railroad Company (which will be called the Carrollton Company). The return of the respondent judge is amplified by the annexation thereto of the pleadings in the case in which the injunction was issued, together with considerable evidence, oral and documentary, received upon the trial of the rule *nisi,* which preceded the issuance of said injunction. The case as thus presented is as follows, to-wit:

Canal street, between Basin street and the river, being the central thoroughfare from, and to, which almost all street cars operated in New Orleans take their departure, and return, had, by reason of the multiplication of tracks and cars, become so confused and congested that the city authorities deemed it necessary that the tracks should be rearranged, and that certain changes should be made in the handling of the cars. In the attempt to frame an ordinance on the subject, they were met with difficulties arising out of the effort to reconcile the conflicting interests of the different companies operating the cars, and progress in the desired direction was, therefore, slow. In May, 1899, however, an ordinance (No. 15,254) was adopted, directing the rearrangement of the tracks, and also directing that the cars of the Rampart and Dryades streets line, of the St. Charles Company, which enter Canal street at Rampart, should, instead of leaving that street immediately upon reaching St. Charles, run on to the ferry landing at the river and thence back, leaving Canal street at St. Charles, upon the return, and

thereby extending the route of said line on Canal street by* about twenty-five hundred feet, and changing the starting point, or stand, from St. Charles street near the corner of Canal, to Canal street near the ferry landing.

It was further provided that over this extension the cars of the St. Charles Company should use the tracks either of the City Railroad Company or of the Carrollton Company as far (in the direction of the ferry landing) as those tracks extended. The ordinance so adopted was variously amended during the year 1899, but the result was unsatisfactory to the Carrollton Company, and no action was taken under it.

In January, 1900, another ordinance was adopted, under which it appears to have been intimated that the city, in the exercise of its administrative and police powers, would make the changes contemplated without waiting for the assent of the railroad companies. Thereupon, the Carrollton Company filed a petition in the Civil District Court, setting up certain rights in itself, attacking the validity of the said ordinances, and praying for an injunction to restrain action under them. The application for the preliminary injunction was, shortly afterwards, discontinued, the case was put at issue, the plaintiff amended by alleging that it was a property holder and tax-payer and desired to appear in that capacity, to which the St. Charles Company answered, and, thereafter, the matter was allowed to rest.

Hostilities were, nevertheless, being carried on in another quarter. It appears that, in December, 1899, the city of New Orleans adopted an ordinance authorizing the sale of certain railroad franchises, which included the franchise to run cars on Canal street between St. Charles and the ferry landing, and the sale was advertised to take place upon March 29th, 1900. Upon March 16th, a few days before the filing of the supplemental petition by the Carrollton Company, as hereinbefore stated, Peter Johnson and E. J. Dare, appearing as citizens and tax-payers, instituted suit attacking said ordinance on various grounds, and praying that it be declared null, and that the proposed sale be perpetually enjoined, and a preliminary injunction having been issued on March 23rd, the defendants in injunction were refused permission to dissolve on bond, and the matter came before this court, with the result that the judge a quo was directed to dissolve the injunction, as on bond; and this order having been complied with, the sale was allowed to proceed (the question as to the validity of such sale being reserved to the merits). And the franchise was adjudicated to the St. Charles Company. It may be remarked here, that the case was afterwards

tried upon its merits, there was judgment in the court *a qua* to the effect that the sale was invalid, an appeal was taken, and the judgment appealed from is reversed in an opinion this day handed down.

In the meantime, a demand had arisen for the repaving of that part of Canal street upon which the congestion exists, and it was desirable, from considerations of both economy and convenience, that any rearrangement of the tracks which was to take place should be accomplished at once, and before the laying of the new pavement. The efforts to bring about some sort of an agreement upon the subject became, therefore, if possible, more earnest and persistent, and, finally, in September, 1900, an ordinance (No. 205, New Council Series) was adopted, amending and re-enacting those which had preceded upon the subject of the rearrangement of the tracks, etc., and dealing with the disputed question arising out of the proposed change with regard to the operation of the cars of the St. Charles Street Company by providing that a third rail should be laid to meet the difference in gauge requirements, so that the St. Charles Company might be able to run its cars over the tracks of the Carrollton Company, but that no cars should be so run until the question of the validity of the franchise claimed by the St. Charles Company should have been finally determined in this court; and, in the event of its being determined adversely to said company, that said third rail should be taken up at the expense of said company. It was believed by the Mayor of the city and by the President of the St. Charles Company that this arrangement would be satisfactory to, and would be acquiesced in by, all parties in interest. And this belief proved to be well founded as to all of the parties save the Carrollton Company, since the other roads operating cars on Canal street signed a contract accepting the ordinance according to its terms. That there was some reason for supposing that the Carrollton Company would pursue the same course appears from certain resolutions adopted by its board of directors, and from a letter written by its acting president to the Mayor and Council of New Orleans, in June, 1899. Later on, however, the company seems to have decided that whilst it would, with full reservation of its rights as against the St. Charles Company, co-operate, in other respects in the rearrangement of the tracks, it would continue to oppose the laying of the third rail, and it notified the St. Charles Company to that effect. The city, in the meanwhile, had contracted for the paving, and the work was in progress, following close upon the rearrangement of the tracks, and moving in the direction of the river. When St. Charles street was reached, the subject became

interesting to the St. Charles Company, for the reason that from that point it was necessary that the third rail should be laid in order to enable it to operate its cars as provided in the ordinance. When, therefore, the Carrollton Company had rearranged its tracks for about a square beyond St. Charles street, and the paving contractor had given notice that he was ready to follow with the paving, the St. Charles Company began the work of putting in the third rail. But this work was not allowed to proceed very far. The employes of the Carrollton Company appeared and placed themselves in the way. Thereupon, the President of the St. Charles Company appealed to the Mayor, and the Mayor order the Chief of Police to preserve the peace, which that officer accomplished by warning the Carrollton Company's employes against further obstructing the work in which the St. Charles Company was engaged. This occurred upon the night of January 23rd, between eight and ten o'clock. Upon the following day, the Carrollton Company filed a supplemental petition in its pending suit against the city and the St. Charles Company, setting up absolute and exclusive ownership in the road beds and tracks upon, and in connection with, which the third rail was being laid; alleging that the ordinance authorizing the sale of the franchise to run cars over said tracks from St. Charles street to the ferry landing, and the sale of such franchise to the said St. Charles Company, were void, and praying for an injunction, and for judgment decreeing the nullity of said ordinance and sale, etc.

After a hearing upon a rule *nisi,* a preliminary injunction was issued as prayed for, enjoining and restraining the city of New Orleans and the St. Charles Company "from interfering by force with the use, " possession, and enjoyment by plaintiff   *   *   *   of its tracks, road " bed, right of way, and franchises on Canal street from Dryades to " Liberty Place in this city, and from continuing in   *   *   *   un- " lawful possession, through the medium of the police, of all that por- " tion of the plaintiff's track on Canal street, between St. Charles and " Camp streets, in this city, and   *   *   *   from enforcing   *   *   * " Ordinance No. 15,254   *   *   *   and the amendments thereto, and " Ordinance No. 205   *   *   *   and the amendments thereto   *   *   * " and from   *   *   *   attempting to exercise any of the rights, privi- " leges, or benefits   *   *   *   attempted to be conferred by virtue of " the alleged adjudication of the franchise, under Ordinance 15,809   * " *   *   and consummated by the contract between the city and the " St. Charles   *   *   *   Company; and particularly enjoining the St.

" Charles Company from exercising any rights or privileges over said " Carrollton    *    *    *    Company's tracks on Canal street from St. " Charles street to Liberty Place    *    *    *    and from laying a third " rail thereon, as authorized by said franchise," etc.

Thereupon, the city and the St. Charles Company moved that said injunction be dissolved, on bond, as to the St. Charles Company, and, under the statute, without bond, as to the city, which motion, having been denied, the present application was made to this court.

In their petition, the relators set forth the various proceedings as hereinbefore described, including the issuance of the injunction; and aver that the effect of said injunction is to stop all paving on the neutral ground of Canal street, from a point between Camp and St. Charles streets and the river, and that said work is one of great public importance and necessity which is being prosecuted by the city government in the exercise of the authority and discretion confided to it by law. They further aver that no attempt was made to prove that the Carrollton Company would suffer any pecuniary injury by the laying of the third rail; that it was proven, and not denied, that the only interference with the property of said company consisted in the laying of said rail in conformity to the provisions of the rearrangement ordinances; that the Carrollton Company had consented to all the work required under said ordinances, and had co-operated in ordering and putting the same in, with the exception of said third rail, against the use of which, alone, by the St. Charles Company, it protested; that relators have a right to bond said injunction, and that they made application for permission to do so, which was refused, and that such refusal was arbitrary and illegal. And relators further aver that the Carrollton Company, by deferring action until it was supposed that the exigency of the paving work would constrain the relators to forego their rights, indicates an intention, illegally, to embarrass and disregard public rights, and that said injunction is an interference by the court, with the action of a co-ordinate branch of the government, acting in the exercise of the police power and for the convenience and safety of the citizens of New Orleans, and they pray for a *mandamus*, etc.

To this petition, the respondent judge makes answer and return as follows, to-wit:

"1.    That the petition herein filed does not accurately and correctly set forth the facts alleged and established, nor the grounds of complaint of the New Orleans and Carrollton Railroad Company, set out in its petition and supplemental petition, upon which this respondent acted;

and, that the court may be more fully informed thereon, respondent annexes to his answer the record of said cases, showing the pleadings, also the evidence and documents filed.

"2.   That respondent found at the hearing of the rule *nisi,* and so held, that the complaint of the plaintiff, the New Orleans and Carrollton Railroad Company, was well founded in fact and in law.   That the relator, the St. Charles Street Railroad Company, had taken forcible possession on the night of Wednesday, January 23rd, 1901, of the road bed, cross ties and tracks of the New Orleans and Carrollton Railroad Company, on Canal street, between St. Charles and Camp streets, in New Orleans.   That said St. Charles Street Railroad Company was aided and actively assisted in so doing by the Chief of Police of New Orleans, and police officers, acting in his presence and under his orders. That the agents and employes of the said New Orleans and Carrollton Railroad Company, there present and engaged in preparing the tracks for paving, then and there being done, were driven from the property by the Chief of Police under threat of arrest and imprisonment.   That the property thus taken by the police from the Carrollton road and delivered to the St. Charles road was the property of the former company, and in no wise the property of the latter, who had no right, title, or ownership therein.   That, acting under police protection, the St. Charles Street Company proceeded to remove certain tie rods from the rails of the track, and attached other tie rods thereto and laid another, or third, rail upon the cross ties of the Carrollton Company, and alongside of the track, connecting the same by spikes to the cross ties of the latter company, and by bolts and other appliances to the third rail, the whole being done during the night of January 23rd.

"That no previous legal proceeding had been taken by the St. Charles Street Railroad Company to divest the ownership of the New Orleans and Carrollton Railroad Company in the property or to enforce at law any right which the former corporation might have or claim to have, over, in, or upon, said track, cross ties, road bed and rails of the latter company; nor had said St. Charles Street Railroad Company made previous payment for the material and property thus appropriated.

That the New Orleans and Carrollton Railroad had never acquiesced in the rearrangement ordinances, or in the franchise ordinances, referred to in the original and supplemental petitions, nor had it in any way acknowledged or recognized or acquiesced in any act, ordinance, or law, of the city of New Orleans, conferring rights on the St. Charles Street Company, on, in, or to, said property of the Carrollton

742 SUPREME COURT OF LOUISIANA,

State ex rel. New Orleans et al. vs. Judge.

Company, or in, and to, the franchise and right of way over the latter's tracks from St. Charles street to Liberty Place, thence to the ferry landing at the head of Canal street.

That the Chief of Police was not acting on the orders or within the scope of the authority given him by law, or by the Mayor of New Orleans. That the latter disclaimed, on the witness stand, having given any orders or authority to the Chief of Police authorizing him to proceed in the manner described.

That respondent held, and now alleges, that the act of the Chief of Police and the St. Charles Street Company, in the premises, was a trespass upon the rights and property of the Carrollton Railroad Company, and utterly without warrant or authority in law, and was an unauthorized seizure and taking of the private property of the Carrollton Railroad Company without previous payment therefor, and was a usurpation and wrong to private rights of property which could not be justified by any consideration of benefit to the public or to the St. Charles Street Railroad Company.

"3. That the Carrollton Railroad Company acted promptly, and as soon as it was ascertained that the St. Charles Street Company intended to exercise the right claimed under the ordinances to lay and use the third rail in question. That the writ of injunction does not interfere in any manner with the paving of Canal street, which can and should proceed without interruption or delay, and without the laying of the third rail, the only effect being that if this court should hereafter maintain the franchise in favor of the St. Charles street road the cost of laying the third rail will be increased by about $3,000, for which cost and damages the relator will be protected by the bond which the respondent has required the plaintiff to give before the injunction may issue. That the rail in question, whenever laid, will be laid on the upper and lower side portions of the neutral ground on Canal street, and will disturb the same only in a very limited space; and it was established that the paving can be pushed on without any reason for delay, whether the third rail is, or is not, laid down, and there is no public necessity for laying same pending judicial inquiry into the rights of the parties in the premises.

"4. That the rearrangement ordinances of the city of New Orleans were attacked by the Carrollton Railroad Company in its original and supplemental petitions, upon the ground that the grant therein conferred upon the St. Charles Street Railroad Company, of a right of

TERM OF 1900-1901. 743

State ex rel. New Orleans et al. vs. Judge.

way on Canal street from St. Charles street to the ferry landing, was not germane to the subject matter and was contrary to the declared objects and purposes of the ordinances, was a violation of the city charter, which requires the selling of such franchises, after advertisement, at auction, to the highest bidder; was a valuable franchise, which would have realized a good price under competition, and was palpably an attempt to give, without consideration, to said St. Charles Street Railroad Company, a valuable and exclusive franchise not granted in said ordinances to the competitors of said railroad company and joint occupants of the Canal street tracks. That, on the face of the papers, said contentions seem to be sound, and make out a *prima facie* case in favor of said plaintiff in injunction.

"5. That the franchise, under Ordinance No. 15,809, A. S., of the city of New Orleans, and the contracts thereunder in favor of the St. Charles Street Railroad Company, are also attacked by the New Orleans and Carrollton Railroad Company, on grounds less extensive, but substantially the same as those urged in the case of Dare & Johnson vs. St. Charles Street Railroad, and, inasmuch as respondent decided said suit against the St. Charles Railroad and said judgment has not yet been reviewed by this court, and inasmuch as respondent has heard nothing to cause him to change his mind upon the merits of the controversy, or to throw doubt upon the correctness of his decision, respondent was bound in law and conscience to hold that the said company had no valid, subsisting, franchise rights in and upon Canal street from St. Charles street to the ferry landing.

"6. That, having reached the conclusion that the plaintiffs, the New Orleans and Carrollton Railroad Company had been wrongfully and forcibly dispossessed of its private property, without previous compensation, or due process of law, and that the defendant, the St. Charles Street Company had been wrongfully and forcibly placed in possession thereof without title or ownership therein or right of possession thereto, and that the rearrangement ordinances and franchise ordinance and contracts aforesaid were invalid and gave no warrant in law for the wrongful action of the police authorities and the St. Charles Street Railroad Company respondent ordered the issuance of the injunction complained of.

"7. That having so found and decided, respondent considered that the acts so prohibited were such as to work the plaintiff in injunction irreparable injury, and respondent refused to permit the writ to be bonded, holding the action justified under the facts, and the interpre-

tation of the statute in State ex rel. Cotting vs. Sommerville, Judge, 28 So. Rep. 977, and other cases on the same subject matter. That respondent believes that in so acting he has properly exercised the discretion vested in him by law.

Wherefore respondent submits the said action and refusal to this honorable court, and for the reasons above given prays that the preliminary orders herein issued may be revoked and recalled and the writ of *mandamus* refused, and for all general and equitable relief."

It seems to us, from this return, taken in connection with the reasons given for issuing the injunction (which are in the record as part of the return) and with the injunction itself, that the judge *a quo* has proceeded upon the theory that the right of the relators to have such injunction dissolved is dependent upon the determination of either of the two questions: (1), as to the validity of the franchise said to have been acquired by the St. Charles Company to operate its cars upon Canal street between St. Charles street and the ferry landing, and (2), as to the right of said company, under and by virtue of said franchise, to make use of the road beds, ties, and rails, which had been prepared and laid at the expense of the Carrollton Company. As to the first of these questions, it appears that he had already decided, in another case, that no valid franchise had been granted; and, giving the plaintiff in injunction the benefit of that decision, he says, in effect, to the defendants: "I have heretofore decided that no valid franchise to operate cars on Canal street between St. Charles street and the ferry landing has been granted to the St. Charles Company. You are now attempting, nevertheless, to exercise that franchise, and the effect of the injunction of which you complain is to restrain to you from doing so. I have found no reason, however, to change my mind, and, holding now, as I have done heretofore, that no such franchise exists, I cannot permit you, by dissolving the injunction on bond, to do something which the law does not authorize."

Pretermitting the question whether the defendants in injunction are attempting to exercise the franchise in question, and assuming for the purposes of the present question that they are so attempting, the view taken by our learned brother seems to involve a decision of the case upon the merits, but without a hearing on the merits. Of course, if the decision in "Johnson & Dare vs. The City et al." is conclusive upon the parties now before the court, it may be said, from the point of view from which we are now considering the matter, that it was properly applied, but supposing that the suit of one tax-payer, suing for himself

and others similarly situated, constitutes *lis pendens* as to a suit against the same parties on the same cause of action by another tax-payer, yet, if the plaintiff is allowed to go on with the second suit, it can hardly, at the same time, be held that the defendants are so bound by the pendency of the first as not to be entitled to be heard upon the merits of the second. And if the relators, as defendants in the court *a qua* were entitled to be heard upon the merits of the question of franchise *vel non,* then the only thing properly before the court, on the motion to dissolve the injunction on bond was, whether such dissolution would work irreparable injury to the plaintiff in injunction, and the fact that, in another case, the respondent had decided that there was no valid franchise, was irrelevant and insufficient as a reason for denying such motion.

But, it abundantly appears from the record that the ordinance (No. 205, New Council Series), under the authority of which it is proposed to lay the third rail, was adopted for the express purpose of avoiding the difficulties which appeared to stand in the way of any attempt to countenance the existence of the franchise in dispute. The situation was as follows: The city found the middle of Canal street covered with car tracks of a certain gauge, and considered it advisable that they should be rearranged, and that the street, at the same time, should be paved. There was one railroad company, however, with cars of a wider gauge, which claimed the right to operate them within the territory in question, and to which the city had undertaken to concede that right, but the matter had become the subject of a litigation, the duration of which was uncertain, and, in the meanwhile, further action in the matter of the paving was suspended, for the reason that if the pavement should be laid with no provision for the wide gauge cars there was the possibility of the public being subjected to the inconvenience, and the parties in interest to the expense, of tearing it up again in order to make such provision, whereas, if the necessary third rail should be laid before, or in connection with, the paving, it was considered that in the event of its being held that no franchise to operate the wide gauge cars had been legally granted, it would be less expensive and less inconvenient to remove the rail than it would be, in the other case, to lay it. The whole purpose of the ordinance No. 205, therefore, was, to waive the question of the validity of the franchise to operate cars as claimed by the St. Charles Company, in order that the paving might not be retarded. The case would not have been materially different if the question of the right to operate wide gauge cars within the disputed

territory had never been raised and had not been pending at all, but the city, in view of the fact that a company operating them elsewhere might at some future time acquire that right had chosen to prepare the street for it in advance. And, that this was the understanding, was apparent not only from the language of the ordinance, which disclaims any purpose to grant a franchise, or to prejudge the question of the validity of such grant, by providing that the rail to be laid shall not be used until the question is so decided, and that in the event of a decision by this court adverse to the validity of the franchise claimed by the St. Charles Company, said rail shall be taken up; but also from the conduct of the parties, since the Carrollton Company, although opposing the laying of the third rail, has co-operated in the other work which can be used only in the event that such third rail is laid.

It will be observed, also, that, whilst the injunction is directed to the City of New Orleans as well as to the St. Charles Company, the rights and obligations of the municipal corporation with respect to the administration of its principal thoroughfare do not seem to have been taken into account. It is, nevertheless, the law, as we understand it, and it has been so declared, in terms, by this court, that the streets of New Orleans are the common property of all the inhabitants of the city and are held by the corporation in trust for their use and benefit; that the corporation is without power to alienate the soil, or to sell or grant the exclusive use of such street, but that it is authorized and required to regulate such use, and cannot divest itself of that authority and obligation, which is part of the police power and is inalienable. And, further, that the corporation has the specific authority to compel all lines of railway operating upon the same street to make use of the same track, and had such authority before the Carrollton Company acquired the right to operate its cars on Canal street.

Act No. 20 of 1882, Sec. 8; R. R. Co. vs. R. R. Co., 44 Ann. 748; R. R. Co. vs. R. R. Co., 47 Ann. 476.

It follows, therefore, that no railway company can be the absolute owner of a road-bed and track established in a street in New Orleans, but that such ownership is qualified by the fact that the ownership of the soil of the street is vested in the public, and the authority to administer and regulate the use of the street is vested, inalienably, in the municipal corporation.

Of the two questions, therefore, upon the decision of which is predicated the recognition of a right in the Carrollton Company to the

injunction and the denial of the right of the city and of the St. Charles Company to release such injunction on bond, the first, *i. e.*, the question of the validity of the grant to the St. Charles Company of the franchise to operate its cars on Canal street, between St. Charles street and the ferry landing, is not in this case; and the second, *i. e.*, the question of the right of the St. Charles Company to lay a third rail outside of the track of the Carrollton Company upon ties laid by said company and to attach the same to the rails laid by the said company, without previous expropriation or compensation, is not in the case, except as an issue between the Carrollton Company and the city, since the St. Charles Company is not assuming to lay such rail by virtue of the franchise ordinance, but by virtue of the rearrangement ordinance, which was adopted by the city in the exercise of its police, as well as its administrative, power. The final question to be determined, then, is, whether, upon the facts as presented, the rights and obligations of the City of New Orleans, in the matter of the administration and regulation of its main thoroughfare, dominate, or whether they are subordinate to the rights asserted by the Carrollton Company, with respect to so much of such thoroughfare as is occupied by the road-bed and tracks of that company?

In considering this question, we find, for the reason, mainly, that we approach it from a different point of view, that we are not altogether in accord with the respondent, as to certain questions, some of them of mixed law and fact and others of fact, which are important to the result. Thus, the respondent says that the "St. Charles * * * Company had taken forcible possession, on the night of Wednesday, January 23, 1901, of the road-bed, cross-ties, and tracks of the Carrollton * * * Company * * * that said St. Charles * * * Company was aided * * * by the Chief of Police and police officers * * * that the agents * * * of the * * * Carrollton * * * Company, there present and engaged in preparing the tracks for paving then and there being done, were driven from the property," etc.

From our reading of the record, we conclude that the Carrollton Company had completed the work of relaying at least one of its tracks for some distance beyond St. Charles street, and that, between eight and ten o'clock at night, the St. Charles Company, acting under the authority of the city ordinance, began the work of putting in the third rail, upon the track thus completed, in order that the paving contractor might not be delayed; the necessity for the completion of the

entire work of rearranging tracks and paving being considered very urgent on account of the great inconvenience and, perhaps, danger which is likely to result from leaving so central a street torn up and unpaved during the approaching carnival. We do not find that when the employees of the St. Charles Company began their work there were any of the employees of the Carrollton Company on the track where the work was begun, and hence the employees of the St. Charles Company used no force and did not drive the employees of the Carrollton Company from the property. Upon the other hand, we understand, that, when the employees of the St. Charles Company began their work, the employees of the Carrollton Company, almost immediately, obstructed them; that the president of the St. Charles Company then appealed to the Mayor, who directed the Chief of Police to preserve the peace, and that the latter officer ordered the employees of the Carrollton Company to get out of the way, and cease their obstruction. And it is in the light of this state of facts that we must consider the charge that the St. Charles Company, aided by the police, took forcible possession of the road-beds, cross-ties and tracks of the Carrollton Company. In a certain sense, no doubt, it is true, that, whilst the employees of the St. Charles Company were engaged in putting a third rail outside of the track of the Carrollton Company, they were in possession of the road-bed and track of the Carrollton Company, but it must be remembered that the road-bed and track in question form part of the middle of the main street of the City of New Orleans, and that the employees of the St. Charles Company were putting down the rail by the authority of the municipal corporation. Their position was not very different, therefore, from that of the paving contractor, who was working under contract with the city, but who, it may be assumed, took possession of the different tracks, and possibly filled the spaces between the ties and covered the road-beds with concrete or some other material, but of whom no complaint is made or is likely to be made for the reason that he was acting under the authority of the city; and the city has not divested herself, and cannot divest herself, by grants to railway companies or otherwise, of either the authority or the obligation to control the condition of her streets. If, then, the paving contract had called for railroad iron, instead of the material used, it is difficult to perceive upon what ground the Carrollton Copmany could have objected; and if no objection could have been successfully urged in such case against the paving contractor, there would appear to be no reason why it should be

sustained when the city, through some other authorized representative, undertakes to lay a single rail in a street which she might pave with rails if she saw fit.

The return of the respondent states "That the Carrollton * * * Company acted promptly and as soon as it was ascertained that the St. Charles * * * Company intended to exercise the right claimed under the ordinance to lay and use the third rail in question."

The meaning of this is not very clear, but the record shows abundantly that the Carrollton Company was apprised long before the night of the 23rd of January, 1901, that the St. Charles Company intended to lay the third rail when the work of rearranging the tracks reached the proper point, and was requested to co-operate with the St. Charles Company in the matter, but refused to do so either by allowing the latter company to contribute to the expense of the special work to be put in or otherwise. And it is also abundantly established that the St. Charles Company did not intend to operate its cars over the disputed territory or make use of the third rail put in by it unless, and until, the right to do so should have been sustained by the judgment of this court.

There has been no effort to show that any pecuniary damage will result to the Carrollton Company by the dissolution of the injunction, and we are unable to conceive how any such damage can result. It is claimed that to permit the laying of the third rail in question will be to permit and authorize an invasion of right, and a trespass upon property. The evidence shows that the rail is to be laid outside of the track, and upon the projecting ends of the cross-ties which support the rails constituting the track; that, in order to lay it in place, the spikes on the outer side of the track rail are drawn and replaced by what are called "filler blocks," being blocks of cast iron which hold the track rail and the third rail in their relative positions; and that the tie rods, *i. e.*, iron rods running from one rail to another, to assist in holding them in position and in keeping the track from spreading, are to be replaced by similar rods, which are long enough to run through all three rails. This construction, it appears is identical with that adopted by the Carrollton Company itself on Canal street, between St. Charles and Baronne, and is not the subject of criticism, the only question being as to the alleged invasion of right and trespass upon property of which the Carrollton Company claims to be the owner. We have already seen, however, that the Carrollton Company is not the owner of the soil upon which its track rests, and that it has only a qualified owner-

750      SUPREME COURT OF LOUISIANA,

State ex rel. New Orleans et al. vs. Judge.

ship in the ties, rails, etc., which constitute its track. The soil is part of the street, the title to which remains in the public, and the administration of which, for all the purposes of a street, is vested in the municipal corporation. The track laid by the railway company was so laid, upon the express condition that the municipal corporation, having no power to grant to a private corporation or to a particular person the exclusive use of any part of the street, should have the right to authorize the use of the said track by other companies, they to pay their proportion of the cost of construction and maintenance. It is evident from this that the case, as presented, bears but little resemblance to that of State *ex rel.* Cotting vs. Sommerville, Judge, in which it appeared that the relator was the sole, absolute, and undisputed owner of land which was about to be taken for a public purpose without previous compensation.

In the case before us, the authority of the municipal corporation to administer Canal street and to control its condition is as far beyond dispute as was the title of relator in the Cotting case to the land which was the subject of that litigation. It cannot be denied that in the exercise of such authority, the city whilst bound not to interfere, unreasonably, or unnecessarily, with the railway company's use and enjoyment of its road-bed and track, can, nevertheless, enter upon such road-bed and track, as it can enter upon any other part of the street, and deal with the same as public interest, safety, or necessity, may require. The question which immediately confronts us, therefore, is, whether the particular act complained of is within the scope of the authority mentioned; that is to say, whether the putting down of the third rail, in the manner and under the circumstances disclosed, is to be regarded as an act done as a matter of public interest, safety, or necessity; in the exercise of the power to administer the streets and keep them in order, and without unreasonably or unnecessarily interfering with the rights granted to the railway company. And this question, we think, must be answered in the affirmative. Absolutely, no interference with the use of its tracks by the railway company results from the mere laying of the third rail; and, absolutely, no pecuniary injury is inflicted. The rail, though laid upon the outside of the track of the company, rests upon the ties which support the track, and which were placed in position by the company, but that is an accident of the situation. The rights of the company, on Canal street, where space is measured by inches, are not to be determined by any rule which might be applied if its tracks were laid through a wilderness upon a right of

way of the usual width. We are not advised that it is necessary, considering the character of the paving which is being done by the city, that cross-ties should be used, and still less that it is essential that they should project beyond the rails constituting the track. We are not, therefore, in a position to hold that the laying of the third rail where it is proposed to lay it will, from any point of view, conflict with the rights granted to the Carrollton Company.

As to the other matters—the substitution of the "filler blocks" for spikes, and of the long tie rods for short ones, it is enough that its property is not injured and that the Carrollton Company is not thereby interfered with in the use of its tracks. We have no reason to believe that there is, or can be, anything in the grant to that company which would authorize it to so maintain its tracks as, unnecessarily, to obstruct the laying of others, and we are of opinion that it would be a misapplication of a valuable principle of law to hold that the acts in question constitute a taking of private property without compensation.

We, therefore, conclude that the alternative writ of *mandamus* herein issued should now be made peremptory, and it is so ordered.